Daniel R. Watkins (SBN 163571)
dw@wl-llp.com
WATKINS & LETOFSKY, LLP
2900 S. Harbor Blvd., Suite 240
Santa Ana, CA 92704
T: 949-476-9400

Kevin T. Snider (SBN 170988)
ksnider@pji.org
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827-6600
T: 916-857-6900

Attorneys for Plaintiffs, MICHELLE LEMONS, RODGINALD CAYETTE, MICHAEL PUNO, SUSANA REYNOSO, ANA FUENTES, MICHAEL PARKS, EVLIN AKSERELIAN, MATTHEW GONZALEZ, PATRICIA GONZALEZ, LAURISSA PROVOST, SUSAN GARCIA, CHRISTOPHER SILVA, GEORGINA GRIEGO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE LEMONS, RODGINALD CAYETTE, MICHAEL PUNO, SUSANA REYNOSO, ANA FUENTES, MICHAEL PARKS, EVLIN AKSERELIAN, MATTHEW GONZALEZ, PATRICIA GONZALEZ, LAURISSA PROVOST, SUSAN GARCIA, CHRISTOPHER SILVA, GEORGINA GRIEGO<br><br>          Plaintiffs,<br><br>vs. | Case No.: 2:21-cv-07296-RGK-JPR<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE CITY OF LOS ANGELES ORDINANCE NO. 1871342**<br><br><br>Date:    December 6, 2021<br>Time:    9:00 a.m.<br>Judge:  R. Gary Klausner |

|   |   |   |
|---|---|---|
| 1 | CITY OF LOS ANGELES; ERIC | |
| 2 | GARCETTI, Mayor of City of Los Angeles; MICHAEL MOORE, Chief | |
| 3 | of the Los Angeles Police Department; | |
| 4 | MATTHEW SZABO, Los Angeles City Administrative Officer; and | |
| 5 | DOES 1-50, inclusive. | |
| 6 | | |
| 7 | Defendants. | |

8   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

9   PLEASE TAKE NOTICE THAT Plaintiffs hereby move this Court pursuant to
10  Federal Rule of Civil Procedure 6 and Local Rule 6-1 for a preliminary injunction
11  enjoining Defendants from enforcing its mandatory vaccination Ordinance No.
12  1871342. The hearing on this motion for preliminary injunction shall be heard on
13  December 6, 2021 at 9:00 a.m. before the Honorable R. Gary Klausner in Courtroom
14  850 of the Roybal Federal Building and U.S. Courthouse located at 255 East Temple
15  Street, Los Angeles, CA 90012.

16  The City of Los Angeles Ordinance No. 1871342 is arbitrary and unreasonable,
17  and it violates Plaintiffs' and other Los Angeles Police Department personnel's
18  Constitutional rights under the California Constitution and the Fourth and Fourteenth
19  Amendments of the United States Constitution necessitating injunctive relief from this
20  Court. If not preliminarily enjoined, the deprivation of personal rights will equate with
21  irreparable injury. There is simply no adequate remedy at law short of injunctive relief
22  from this Court to stop the infringement of Constitutional rights presented by the
23  City's Ordinance that mandates vaccination of its employees.

24  ///
25  ///
26  ///
27  ///
28

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE
CITY OF LOS ANGELES ORDINANCE NO. 1871342**

-2-

This motion is made on the grounds set forth in the accompanying memorandum of points and authorities; expert declarations and exhibits in support; all pleadings and papers filed in this action; the argument of counsel; and further evidence as the Court may consider at or before a hearing regarding this motion.

DATED: October 20, 2021            WATKINS & LETOFSKY, LLP

                                    */s/  Daniel R. Watkins*
                          By:      _____
                                    Daniel R. Watkins
                                    2900 S. Harbor Blvd., Suite 240
                                    Santa Ana, CA 92704
                                    *Attorneys for Plaintiffs*


DATED: October 20, 2021            PACIFIC JUSTICE INSTITUTE

                                    */s/  Kevin T. Snider*
                          By:      _____
                                    Kevin T. Snider
                                    P.O. Box 276600
                                    Sacramento, CA 95827-6600
                                    *Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................................... 4

TABLE OF AUTHORITIES .................................................................. 5

SUMMARY OF ARGUMENT.............................................................. 7

BACKGROUND ................................................................................... 7

LEGAL ARGUMENT ........................................................................ 16

A. Legal Standard for Temporary Restraining Order and Preliminary Injunction ........................................................................................... 16

B. Plaintiff Are Likely To Succeed on the Merits …...................................... 17

1. Count I – Violation of the United States Constitution – Fourth and Fourteenth Amendments – Right to Privacy, Personal Autonomy, and Personal Identity …………………………………………....…............................................... 17

2. Count II – Violation of the California Constitution, Article 1, Section 1 – Right to Privacy ……………………………………………………………… 20

3. Count III – Violation of the Fourteenth Amendment – Due Process ………….. 21

4. Count IV – Violation of Due Process 42 U.S.C. § 1983 ……………………… 23

C. Irreparable Harm Without Injunctive Relief …………………………….. 24

D. Plaintiffs' Injury Outweighs any Potential Hardship to City …………….. 24

E. Granting the Injunction Will Serve the Public Interest …………………..…… 25

CONCLUSION ................................................................................... 26

## **TABLE OF AUTHORITIES**

**CASES**                                                                 **PAGE**

*ADT v. Capital Connect*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015) ………….. 24

*All for the Wild Rockies v. Cottrell*, 632 F.3d at 1131 ……………………..…… 25

*Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) …………………………. 22

*Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ……………………..…… 24

*Cassell v. Snyders*, 990 F.3d 539, 543, 545 (7th Cir. 2021) …………………….... 19

*City of Santa Cruz v. Ashcroft*, 279 F. Supp. 2d 1192 (N.D. Cal. Aug. 28, 2003 …………………………………………………………………..……….. 17

*Cruzan*, 497 U.S. at p. 278 (1990) …………………………………………….. 17

*Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 277-78 (1990) …... 17

*Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 19 (2004) …………………………………. 21

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ……………………………………………………………………. 25

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ………………………………………... 24

*G & V Lounge, Inc.*, 23 F.3d at 1079 …………………………………………… 25

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) …………………………………………………………………. 25

*Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011) …………… 25

*Leeper v. Beltrami*, 53 Cal.2d 195, 203 (1959) …………………………………. 21

*Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ………………………….. 24

*Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ………………………… 24

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) ……..…. 16

*Reno v. Flores*, 507 U.S. 292, 301-02 (1993) ………………………………………… 21

*Roman Catholic Diocese*, 141 S. Ct. at p. 68 …………………………………… 25

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020) ……..…… 22

*Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 68 ………………………….… 22

*Sable Commc ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) ……………………….. 18

*Sanchez v City of Fresno*, 914 F. Supp. 2d 1079, 1100-01 (E.D. Cal. 2012) …… 17

*U.S. v. Playboy Entm t Grp.*, 529 U.S. 803, 813 (2000) ………………………… 18

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) …………………..……… 18

*Washington v. Harper*, 494 U.S. 210 (1990) ………………………………………… 18

*Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993) ………………………………….... 26

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) …..…… 16, 24

*Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) ………………………………………… 26

## STATUTES

California Code of Civil Procedure §4.701(b) …………………………...……….. 8

21 U.S.C. § 360bbb-3(e)(1)(A)(ii) ………………………………………………… 23

## MEMORANDUM OF POINTS AND AUTHORITIES

### SUMMARY OF ARGUMENT

The City of Los Angeles' ("City") stated objective in Ordinance No. 1871342 ("Ordinance") of stopping infections by compelling vaccination defies science and reason. It is now well-known and accepted that [1] the non-sterilizing COVID-19 vaccines do not stop transmission of the virus, [2] post COVID-19 immunity provides more durable and robust protections against transmission of COVID-19 and severe disease than vaccinated immunity, and [3] unvaccinated and vaccinated individuals have been safely working for the City for over a year and a half wearing masks to mitigate against transmission of the disease. To this end, the City's Ordinance is about status and is promulgated simply by the Defendants' capricious and arbitrary goal of having a "fully vaccinated workforce".

In fact, the entire public health purpose behind mandating vaccination is undermined by the simple fact that the non-sterilizing COVID-19 vaccines do not stop transmission of the virus. This being the case, the Ordinance does not serve the public interest of protecting the health, safety and well-being of the City's workforce and the public they serve. And with vaccination not serving a public health interest, it only serves the individual medical choice.

Lastly, implementation of City's Ordinance will actually counteract the stated purpose of stopping infections. The Ordinance puts vaccinated employees, who can contract and transmit the virus, in direct contact with the community and coworkers without using any safety protocols to limit transmission.

### BACKGROUND

**Scope of City of Los Angeles Mandate**

On July 27, 2021, Mayor Eric Garcetti and City Council President Nury Martinez announced "that they would push for mandatory COVID-19 vaccines for City employees, beginning with a requirement that workers either submit proof of

vaccination or a weekly negative test."[1] On August 20, 2021, Mayor Garcetti signed and approved Ordinance No. 1871342.[2] Among other things, the Ordinance mandates at Sec. 4.701(b) that "as of October 20, 2021, the *COVID-19 vaccination and reporting requirements are conditions of City employment* and a minimum requirement for all employees, unless approved for an exemption from the COVID-19 vaccination requirement as a reasonable accommodation for a medical condition or restriction or sincerely held religious beliefs." (Emphasis added.) Section 4702 of the Ordinance goes on to state that

> "*The City's goal is to have a vaccinated workforce.* As such, employees will not have the option to 'opt out' of getting vaccinated and become subject to weekly testing. Only those with a medical or religious exemption and who are required to regularly report to a work location are eligible for weekly testing."

**The Ordinance is Arbitrary and Unreasonable**

The "Urgency Clause" of the Ordinance incorrectly concludes that "Vaccination is the most effective way to prevent transmission…" and "Unvaccinated employees are at a greater risk of contracting and spreading COVID-19 with the workplace, and risk transmission to the public that depends on City services." Sec. 4705. Sec. 2. Of course, the City does not identify any current data or scientific studies supporting either presumption because current data establishes that fully vaccinated individuals contract and transmit the COVID-19 and Delta variant just like

---

[1] A complete copy of the Mayor's statement dated July 27, 2021 is located at Mayor Garcetti, Council President Martinez push toward mandatory vaccines for City employees | Office of Los Angeles Mayor Eric Garcetti (lamayor.org)
[2] A copy of Form Gen. 160A, regarding "MANDATORY COVID-19 VACCINATION ORDINANCE", Report No. R21-0252, a report of the "OFFICIAL ACTION OF THE LOS ANGELES CITY COUNCIL", and Ordinance 187134 are attached as **EXHIBIT 1.**

unvaccinated individuals; individuals with naturally acquired immunity are better protected against contracting or spreading the virus, and from severe illness or death from COVID-19; and unvaccinated individuals can safely work with accommodations.

Contrary to the lack of evidence behind the Urgency Clause, the Director of the Center for Disease Control ("CDC"), Rochelle Walensky, admitted that the vaccines help with regard to reducing the severity of the symptoms for those who catch COVID-19 "*but what they can't do anymore is prevent transmission*."  In fact, the CDC altered its mask wearing guidance to include vaccinated individuals after determining that vaccinated individuals spread the disease just the same.[3]

As further evidence of their misplaced motivation, Defendants completely ignore peer reviewed studies and data that conclusively establish naturally acquired immunity provides longer lasting and more robust protection against severe infection than immunity generated by the COVID-19 vaccines.  (See "General Summary of Data and Science at Issue" section below.) Defendants' refusal to allow exemption for employees with naturally acquired immunity is inconsistent with the stated intent to provide a safe and healthy work environment. Defendants also ignore the fact that City employees have been safely working for the last 18 months with safety protocols including masks and social distancing.

**Implementation of the Ordinance**

For months before the signing of the Ordinance, the City relied on wearing masks for unvaccinated people as the primary means of protecting the peace, health, and safety of the employee, fellow employees, or the community. (See Exhibit 2, at ¶ 10; and Exhibit 3 at ¶ 9.)

---

[3] https://www.youtube.com/watch?v=TKFWGvvlVLI (August 6, 2021, CDC Director, in an interview with CNN's Wolf Blitzer, starting at time mark 0:56 to 1:56.

Once the Ordinance was implemented, Mayor Garcetti reiterated his arbitrary goal by stating on September 14, 2021,

> This policy allows for medical and religious exemptions to protect certain workers' health and constitutional rights, *but* let me be absolutely clear: We will not tolerate the abuse of these exemptions by those who simply don't want to get vaccinated."[4] "To anyone thinking about filing a disingenuous exemption request, I strongly urge that you reconsider. Every request will be carefully vetted, and *our goal will always be to get as many Angelenos vaccinated as possible*"[5] (Emphasis added.)

**General Summary of Data and Science at Issue**

(Plaintiffs present the Declaration of Jayanta Bhattacharya, M.D., Ph.D. as Exhibit 4 to provide a detailed assessment of current data and science with on several items at issue in this matter.[6])

<u>Vaccinated People Transmit the Delta Variant Just the Same as Unvaccinated People</u>

Viral carriage of COVID-19 by the vaccinated is reflected in the recent outbreak in Barnstable County, Massachusetts, which has a 69% vaccination coverage rate among its eligible residents.  A recent CDC investigation found that 74% of those infected in the outbreak were fully vaccinated for COVID-19 and, even more alarming, the vaccinated had on average more virus in their nose than the unvaccinated that were infected. Among five COVID-19 patients who were hospitalized, four were

---

[4] [Nearly 11% of LA City Employees Plan To Seek Exemption From Vaccine Mandate | KFI AM 640 (iheart.com)](#)
[5] [Thousands of LA Workers Fail to Provide Vaccine Proof or Request Exemptions – NBC Los Angeles](#)
[6] See Declaration of Jayanta Bhattacharya, M.D., Ph.D. attached as **EXHIBIT 4**.

fully vaccinated. The study reported zero cases of infection among those that previously had COVID-19.[7]

This finding forced the Director of the CDC, Rochelle Walensky, to admit on CNN that individuals vaccinated for COVID-19, while having less symptoms, can still become infected with and transmit the virus.[8] Dr. Walensky was asked by Wolf Blitzer: "You get COVID, you're fully vaccinated, but you are totally asymptomatic, you can still pass on the virus to someone else, is that right?" Dr. Walensky answers "That is exactly right." Ibid. Similarly, breakthrough infections are possible after vaccination, as the CDC's team investigating vaccine breakthrough infections itself recognizes.[9] On a CDC FAQ webpage,[10] the CDC writes about vaccine mediated immunity and admits further that "We don't know how long protection lasts for those who are vaccinated." (See Exhibit 4, ¶ 53.)

A recent study from Qatar which tracked 927,321 individuals for six months after vaccination concluded that the Pfizer vaccine's "induced protection against infection appears to wane rapidly after its peak right after the second dose, but it persists at a robust level against hospitalization and death for at least six months following the second dose." (See Exhibit 4, ¶ 19.) *The key numbers from the Qatari study show that vaccine mediated protection against infection peaks at 72.1% zero to four weeks after the second dose, and then declines to 0%, 20 weeks after the second*

---

[7] https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm

[8] https://www.youtube.com/watch?v=TKFWGvvlVLI (August 6, 2021, CDC Director, in an interview with CNN's Wolf Blitzer, starting at time mark 0:56 to 1:56.

[9] CDC COVID-19 Vaccine Breakthrough Case Investigations Team (2021) COVID-19 Vaccine Breakthrough Infections Reported to CDC — United States, January 1–April 30, 2021. May 28, 2021. https://www.cdc.gov/mmwr/volumes/70/wr/mm7021e3.htm.

[10] US Centers for Disease Control (2021) Frequently Asked Questions About COVID-19 Vaccination. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html.

*dose. According to this result, vaccines only protect against infection (and therefore disease spread) for a short period of time after the second dose of the mRNA vaccines.* (See Exhibit 4, ¶ 20.) The Qatari study is no outlier. Another recent study documented declining vaccine efficacy in the first three months after vaccination against disease transmission in the era of the delta variant. (See Exhibit 4, ¶ 22.)

Yet another study, conducted in Wisconsin, confirmed that vaccinated individuals can shed infectious SARS-CoV-2 virus. The authors analyzed nasopharyngeal samples to check whether patients showed evidence of infectious viral particles. They found that vaccinated individuals were at least as likely as unvaccinated individuals to be shedding live virus. Combined with other studies these data indicate that vaccinated and unvaccinated individuals infected with the Delta variant might transmit infection. Importantly, we show that infectious SARS-CoV-2 is frequently found even in vaccinated persons…Vaccinated and unvaccinated persons should get tested when symptomatic or after close contact with someone with suspected or confirmed COVID-19. (See Exhibit 4, ¶ 22.)

In a study recently published by the Public Health Emergency COVID-19 Initiative concludes that increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States. At the country-level in the United States, there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases. In fact, the trend line suggests a marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per 1 million people.[11]

<u>Natural Immunity Provides Robust, Long-Term Protection</u>

Substantial research establishes that a COVID-19 infection creates immunity to the virus at least as robust, durable, and long-lasting as that achieved through

---

[11] <u>Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States (nih.gov)</u>

vaccination.[12] (The entire discussion on this issue is set forth Exhibit 4, ¶¶ 11-24.) Multiple extensive, peer-reviewed studies, comparing natural and vaccine immunity have now been published. These studies overwhelmingly conclude that natural immunity provides equivalent or greater protection against severe infection than immunity generated by mRNA vaccines (Pfizer and Moderna). (See Exhibit 4, ¶ 14.) Studies have demonstrated prolonged immunity with respect to memory T and B cells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B cells following naturally acquired immunity. (See Exhibit 4, ¶ 13.)

*It makes no sense to require vaccines for recovered patients. For them, it simply adds a risk without any benefit.* (Emphasis added.) Both vaccine-mediated immunity and natural immunity after recovery from COVID-19 infection provide extensive protection against severe disease from subsequent SARS-CoV-2 infection. There is no reason to presume that vaccine immunity provides a higher level of protection than natural immunity. (See Exhibit 4, ¶ 11.) [R]ecovered COVID-19 patients have strong, long-lasting protection against severe disease if reinfected, and evidence about protective immunity after natural infection is at least as good as from the vaccines. (See Exhibit 4, ¶ 8.)

---

[12] Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccination In Previously Infected Individuals*, MEDRXIV (June 5th, 2021), *available at* https://bit.ly/2TFBGcA (last visited Aug. 1, 2021); *see also* Yair Goldberg, et al., *Protection of Previous SARS-Cov-2 Infection Is Similar to That of BNT162b2 Vaccine Protection: A Three-Month Nationwide Experience From Israel*, MEDRXIV (Apr. 20, 2021), *available at* https://bit.ly/3zMV2fb (last visited Aug. 1, 2021); Smerconish, *Should Covid Survivors and the Vaccinated Be Treated the Same?*: CNN Interview with Jay Bhattacharya, Professor of Medicine at Stanford University (June 12, 2021), *available at* https://cnn.it/2WDurDn (last visited Aug. 1, 2021); Marty Makary, *The Power of Natural Immunity*, WALL STREET JOURNAL (June 8, 2021), *available at* https://on.wsj.com/3yeu1Rx (last visited Aug. 1, 2021).

Studies also confirm the efficacy of natural immunity against reinfection of COVID-19. For example, an Israeli study of approximately 6.4 million individuals demonstrated that natural immunity provided equivalent if not better protection than vaccine immunity in preventing COVID-19 infection, morbidity, and mortality. Of the 187,549 unvaccinated persons with natural immunity in the study, only 894 (0.48%) were reinfected; 38 (0.02%) were hospitalized, 16 (0.008%) were hospitalized with severe disease, and only one died, an individual over 80 years of age. In summary, the overwhelming conclusion of the pertinent scientific literature is that natural immunity is at least as effective against subsequent reinfection as even the most effective vaccines. (See Exhibit 4, ¶ 15.)

In short, *there is no medical or scientific reason to believe that vaccine immunity will prove longer lasting than natural immunity, much less that all currently approved vaccines will be expected to prove more durable than natural immunity despite their different technological foundations and dosing protocols.* (See Exhibit 4, ¶ 23.)

### The Vaccines are Not Risk Free

Clinical evidence indicates that those who have recovered from COVID-19 could have a heightened risk of adverse effects compared with those who have never had the virus. This may be because vaccine reactogenicity after the first dose is higher among those with prior immunity. (See Exhibit 4, ¶ 28.) Moreover, there is a paucity of data on the proper use of the vaccine with various medical conditions. (See Exhibit 4, ¶ 24-31.)

### Asymptomatic Disease Spread is Rare

The best evidence on how frequently asymptomatic disease spread occurs comes from a large meta-analysis of 54 studies from around the world of within-household spread of the virus – that is, from an infected person to someone else living in the same home (Madewell et al. 2020). This study represents the most

comprehensive survey of the vast empirical literature on asymptomatic spread. The primary result is that symptomatic patients passed on the disease to household members in 18% of instances. In comparison, those infected but without symptoms (asymptomatic and pre-symptomatic patients) passed on the infection to household members in only 0.7% of instances. (See Exhibit 4, ¶ 33.) There is some additional evidence on this issue. A large study of 10 million residents of Wuhan, China, all tested for the presence of the virus, found a total of 300 cases, all asymptomatic. A comprehensive contact tracing effort identified 1,174 close contacts of these patients, none of whom tested positive for the virus. This is consistent with a vanishingly low level of asymptomatic spread of the disease. (See Exhibit 4, ¶ 34.)

By contrast with asymptomatic patients, symptomatic patients, vaccinated or not, are very likely to infect others with the virus during extended interactions, especially in the initial period after they develop symptoms. A careful review of 79 studies on the infectivity of COVID-19 patients found that even symptomatic patients are infectious for only the first eight days after symptom onset, with no evidence of live virus detected beyond day nine of illness. (See Exhibit 4, ¶ 35.) Spread of the disease in less intimate settings by asymptomatic individuals – including in the context of the Defendants' work environment – are likely to be even less likely than in the household. (See Exhibit 4, ¶ 39.)

<u>Unvaccinated Individuals Can Safely Work With Accommodations</u>

*The proper baseline for assessing the reasonableness of an exemption policy is not what kind of policy would produce the maximum reduction in risk, but rather what exemption options would reduce the risk posed by those receiving an exemption to a level similar to that posed by those complying with the City's vaccination requirement.* After all, the City is willing to tolerate the risk of infection posed by the vaccinated— a risk that increases substantially a few months after vaccination.  (See Exhibit 4, ¶ 42.) So, can Defendants keep their employees and the public safe if they do not

mandate that all employees be vaccinated? *The answer is a definitive yes.* Most obviously, the City could safely accommodate those employees who have not previously been infected with from COVID-19 but have religious or medical reasons for not wanting the vaccine by requiring daily symptom checking paired with rapid antigen tests to confirm if a worker is infectious. (See Exhibit 4, ¶ 10.)

The City could also exempt all employees who have recovered from COVID-19 infection from a vaccine requirement. Such employees pose as little and likely, less risk of spreading COVID-19 and Delta Variant than fully vaccinated workers who have not recovered from COVID-19. (See Exhibit 4, ¶ 40.) Also, the data on the asymptomatic v symptomatic spread noted above reveals that Defendants can keep their employees and the community safe from COVID-19 disease spread by adopting a robust sick policy by simply requiring workers – vaccinated and unvaccinated – to report daily whether they are experiencing symptoms consistent with COVID-19. (See Exhibit 4, ¶ 32, 41 and 43.)

## **LEGAL ARGUMENT**

## **A.    Legal Standard for Temporary Restraining Order and Preliminary Injunction**

To obtain a temporary restraining order or preliminary injunction, plaintiffs must show (1) they are likely to succeed on the merits, (2) they will suffer irreparable harm absent injunctive relief, (3) the balance of the equities tip in their favor, and (4) the public interest favors injunctive relief. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs satisfy each of the elements and the goal of this motion is to maintain the status quo, i.e. maintain Plaintiffs' employment status without vaccination while continuing to use safety measure already in place while this litigation is pending.

**B.     Plaintiffs Are Likely To Succeed on the Merits**

As established above, vaccination does not stop the spread of COVID-19 and as such, mandatory vaccination does not serve a public health interest designed to address a public health crisis. Instead, vaccination only serves to satisfy a personal medical choice.

**1.     Count I – Violation of the United States Constitution – Fourth and Fourteenth Amendments - Right to Privacy, Personal Autonomy, and Personal Identity**

The Fourteenth Amendment's due process clause provides heightened protection against government interference with certain fundamental rights and liberty interests. *Sanchez v City of Fresno*, 914 F. Supp. 2d 1079, 1100-01 (E.D. Cal. 2012) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Whether refusing medical treatment is a fundamental right is tested against whether it was deemed fundamental in "our nation's history, legal traditions, and practices," *Glucksberg*, 521 U.S. at 710. In *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, at 287, 301, 330 the Supreme Court determined the existence of a constitutionally protected liberty interest in refusing unwanted medical treatment was based on a long line of earlier cases recognizing such a right. The Supreme Court determined such refusal is fundamental right to maintain bodily integrity and to protect against unjustified invasions of one's body by the state. *Cruzan* 497 U.S. at 277-78 (1990). The right to bodily integrity includes the concept that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment. *Ibid.*, See also *Washington v. Harper*, 494 U.S. 210 (1990). See *City of Santa Cruz v. Ashcroft*, 279 F. Supp. 2d 1192 (N.D. Cal. Aug. 28, 2003 - It is well established that these fundamental liberty interests include the right to bodily integrity.)

In addition, the Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The United States Supreme Court has explained that invasive medical testing, injections, and other bodily intrusions constitute a "search" within the meaning of the Fourth Amendment. The Fourth Amendment has been made applicable to the states and their political subdivisions through the Fourteenth Amendment.

The Supreme Court explained that any restriction implicating a fundamental right must be narrowly tailored to promote a compelling Government interest. *U.S. v. Playboy Entm t Grp.*, 529 U.S. 803, 813 (2000). If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. Id.; see also *Sable Commc ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989).

On the issue of compelling state interest, the City has not provided any data or other information supporting the notion that a continued state of emergency caused by COVID-19 and the variances compels the City to take extraordinary measures such as mandatory vaccination. As of October 18, 2021, transmission level of COVID-19 in California has improved the yellow "moderate" color. The state is averaging 34.4 cases for every 100,000 people according to the CDC in the week preceding October 18, 2021.[13]  Given that California is no longer in the "substantial" or "high" ranking in terms of transmission rate; that the vaccine does not stop transmission; that natural immunity is better protection against transmission than vaccination; and that several other safety protocols, including masks, daily screenings and symptomatic testing, are currently being used to continue to reduce transmission of COVID-19, the current

---

[13] https://www.foxla.com/news/california-becomes-only-u-s-state-to-improve-to-yellow-moderate-covid-19-transmission-level

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE CITY OF LOS ANGELES ORDINANCE NO. 1871342**

state of things regarding transmission is stable and there is little justification for mandating vaccination and violating the fundamental rights of City employees.

In addition, the facts presented herein clearly establish that violating individuals' fundamental rights by compelling vaccination is nowhere near the least restrictive means to protect the health, safety and well-being of the City's workforce and the public. The overwhelming body of data and evidence is that the vaccine does not stop transmission and unvaccinated individuals have been working safely with accommodations including daily screenings, masks and symptomatic testing and quarantine, if necessary. (See Exhibit 4, Declaration of Dr. Bhattacharya.)

Moreover, the Ordinance contradicts itself. The Ordinance claims an intent to reduce transmission of COVID-19 but the Ordinance does nothing to mitigate against the transmission of COVID-19 through vaccinated individuals who we know transmit the disease just like the unvaccinated. The city's promotion of a mandatory vaccination Ordinance amid this contradiction and the overwhelming evidence makes clear that the mandate clearly is not narrowly tailored.

Regarding Jacobson, the Supreme Court in 2020 implicitly narrowed the perceived breadth of *Jacobson* in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020) (per curiam), not by expressly abrogating *Jacobson*, but by holding that (i) *normal* strict scrutiny applied to a Free Exercise Clause challenge to non-neutral pandemic restrictions on the number people in houses of worship. *Id.* at pp. 66-69. Strict scrutiny requires the government to prove its restriction to be the least restrictive means to further a compelling interest, and to do so by evidence. The normally applicable scrutiny level is applicable to challenges to restrictions under pandemic-fighting authority, i.e., not *Jacobson*'s analysis. See also, *Cassell v. Snyders*, 990 F.3d 539, 543, 545 (7th Cir. 2021). So, the applicable scrutiny under current jurisprudence applies, with admissible evidence clearly needed from the City to determine whether government action meets the relevant level of scrutiny. As

mandated vaccinations are a substantial burden, the City must prove narrow tailoring to a compelling interest that justifies mandatory vaccinations.

### Count II – Violation of the California Constitution, Article 1, Section 1 – Right to Privacy

Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety, happiness and privacy." This provision is self-executing. Article I, Section 1 is broader than the corollary privacy rights protected in the United States Constitution. Article I, Section 1 has been interpreted by the courts of this state to protect both informational and autonomy privacy. Moreover, the right to refuse medical treatment has long been recognized as a fundamental privacy right in this state. This includes the internal medical condition of one's body, including the presence of vaccines, antibodies, and pathogens, is highly personal and confidential, and therefore a protected privacy interest well within the ambit of Article I, Section 1. Absent a strong showing of need, such as safe operation of dangerous equipment, the courts of this state have long held that employers may not demand that employees submit to invasive testing, allow themselves to be injected with foreign substances, or disclose internal bodily conditions. Moreover, Plaintiffs have a reasonable expectation of privacy that their internal bodily condition will not be demanded, collected, or recorded by their employer, nor will it be disclosed to other individuals, agencies, or entities without their consent.

Defendants' mandate constitutes a serious invasion of both the informational and autonomy privacy aspects of Article I, Section 1. Subjecting City employees to a new condition of employment, not contemplated at the time of hire—forces them to choose between their livelihood, in a time of acute nationwide economic hardship, and

preservation of their fundamental constitutional privacy rights to personal autonomy and bodily integrity and information.

Defendants Ordinance's effect on privacy, association, and expression are even more egregious than the effect on privacy alone and therefore, require Defendants to identify a compelling interest achieved by the least restrictive means to justify its mandate and restrictions. Defendants have not shown, nor can they show, a compelling, substantial, or even legitimate need for ordering all City employees, regardless of position or natural immunity, to submit to vaccines or be punished with regular testing and the other restrictions detailed above, especially when less intrusive means remain available.

Lastly, by the Ordinance, Defendants have directed department heads to ascertain, collect, and record the vaccination status of employees, including Plaintiffs. Defendants' Ordinance constitutes a massive, overbroad, and unwarranted intrusion into the confidential medical conditions of Plaintiffs and thousands of employees for Defendants. Among other ramifications, Article I, Section 1 protects Californians from the unnecessary and overbroad collection, retention, and stockpiling of their sensitive personal information by both governmental and non-governmental entities.

## 2. Count III – Violation of the 14th Amendment – Due Process

The Due Process Clause of the Fourteenth Amendment provides, "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, sec. 1. The Due Process Clause also forbids that the government infringe on certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). In *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 19 (2004) the court ruled that coercion eviscerating informed consent violates federal law. See also *Leeper v. Beltrami*, 53 Cal.2d 195, 203 (1959) - "Under modern law duress is not limited to threats against the person. It may also consist of

threats to business or property interests." It is well established that individuals have a fundamental liberty interest in and right to bodily integrity and informed consent. See *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002). The United States Supreme Court recently confirmed this point in *Roman Cath. Diocese of Brooklyn, 141 S. Ct. 63 (2020)* where the Court granted an injunction against Governor Cuomo's public health restrictions on religious services *because the restrictions were not actually serving public health in a manner consistent with the Constitution*; and especially Justice Gorsuch concurring,

> "Why have some mistaken this Court's modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic? In the end, I can only surmise that much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do." *Id.* at 214.

Plaintiffs herein have fundamental constitutional rights to bodily integrity, especially to be free from unconsented or coerced medical treatment. They are being coerced by Defendants to obtain an unwanted and unwarranted vaccine or lose their jobs. The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment. Plaintiffs herein do not consent to the proposed medical treatment.

In addition, the facts presented herein clearly establish that violating individuals' fundamental rights by compelling vaccination is nowhere near the least restrictive means. Unvaccinated individuals can safely work with accommodations including daily screenings, masks and symptomatic testing and quarantine, if necessary. (See Exhibit 4, Declaration of Dr. Bhattacharya.)

### 3. Count IV – Violation of Due Process 42 U.S.C. § 1983

The United States Constitution and federal laws are the "Supreme Law of the Land" and supersede the constitutions and laws of any state. State law is pre-empted to the extent that it conflicts with federal law. Federal law need not contain an express statement of intent to preempt state law for a court to find any conflicting state action invalid under the Supremacy Clause. Rather, federal law preempts any state law that creates an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

The Emergency Use Authorization ("EUA") statute mandates informed and voluntary consent. See 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). 137. The EUA statute expressly states that recipients of products approved for use under it be informed of the "option to accept or refuse administration," and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." When read against the backdrop of what the Constitution requires and against the common law rules from which the constitutional protections for informed consent arose, Congress's intent to protect informed consent is especially clear.

Defendants' coercion of Plaintiffs by making enjoyment of their constitutionally and statutorily protected consent rights contingent upon receiving an experimental vaccine, cannot be reconciled with the letter or spirit of the EUA statute. The conflict between the Ordinance and the EUA statute is particularly stark given that the statute's informed consent language requires that recipients be given the "option to refuse" the EUA product. The Ordinance contradicts the law because it forces Plaintiffs and all City employees to sustain significant injury to their career if they do not want to take the vaccine, hence it is in violation of the same.

By superseding 21 U.S.C. § 360bbb-3(e)(1)(A)(ii), the Ordinance deprives the Plaintiffs of the due process of the law guaranteed to them as citizens under the

Fourteenth Amendment. As such, the Ordinance is invalid pursuant to Article VI, Cl. 2 of the United States Constitution, and must be enjoined and set aside.

## C.   Irreparable Harm Without Injunctive Relief

The loss of a constitutional right, "for even [a] minimal period of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "When reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (emphasis added); see also *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing Elrod). Because "a constitutional right is being threatened or impaired" in this case, "a finding of irreparable injury is mandated." "[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008). An irreparable harm is one that "cannot be undone," and an injunction is appropriate if the "anticipated injury is imminent and irreparable." *ADT v. Capital Connect*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015).

The likelihood of irreparable harm to Plaintiffs is substantial and immediate. The mandate forces them to choose between their livelihood, in a time of acute nationwide economic hardship, and preservation of their fundamental constitutional privacy rights to personal autonomy and bodily integrity and information.

## D.   Plaintiffs' Injury Outweighs any Potential Hardship to City.

To qualify for injunctive relief, Petitioners must establish that "the balance of equities tips in [their] favor." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). In assessing whether the Petitioners have met this burden, the district court has a "duty . . . to balance the interests of all parties and weigh the damage to

each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). The State "is in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011).

As explained above, the constitutional rights of Plaintiffs and other LAPD personnel are currently being threatened or impaired. Without the injunction, Plaintiffs herein face immediate and irreparable harm by virtue of the enforcement of the Ordinance, either by irreversibly injecting their bodies with an experimental medication that violates their personal beliefs and/or their health, or they lose their livelihoods. This irreparable harm is real and underway.

The only hardship to be suffered by the City and Defendants with an injunction is that the City and Defendants will have to put a hold on achieving the arbitrary and unreasonable goal of a "fully vaccinated workforce". The City can actually provide better protection against transmission through daily screenings, mask wearing, and symptomatic testing. With mandatory vaccination, Defendants are choosing "the way of greater interference" and they should be enjoined from doing so.

**E.     Granting the Injunction Will Serve the Public Interest.**

Courts in the Ninth Circuit apply a sliding scale approach to preliminary relief. See *All for the Wild Rockies v. Cottrell*, 632 F.3d at 1131. The reviewing court must balance the elements "so that a stronger showing of one element may offset a weaker showing of another." *Ibid.* The Supreme Court held, in *Roman Catholic Diocese*, that "even in a pandemic, the Constitution cannot be put away and forgotten [… and] it has not been shown that granting the applications will harm the public." *Roman Catholic Diocese*, 141 S. Ct. at p. 68.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc*., 23 F.3d at 1079; see also *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that "the public as a whole has a significant interest in ensuring

equal protection of the laws . . .”). “Religion is the first of our rights under the First Amendment and the Bill of Rights. The right to the free exercise of religion is a precious American invention . . . to be jealously guarded. It is the right of a human being to respond to what that person's conscience says is the dictate of God.” *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). The value of religious freedom has been “zealously protected, sometimes even at the expense of other interests of admittedly high social importance.” *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972).

Defendants' enforcement of the Ordinance conditioning employment on vaccine administration is a direct attack, under color of law, on Plaintiffs' bodily integrity and personal autonomy. This unconstitutional abuse of power is harming public health, not advancing it. Defendants have no reasonable basis for believing that all or even most of the individuals it is ordering to be vaccinated pose any greater threat to public safety than City employees who are vaccinated.

## **CONCLUSION**

This Court should also grant the motion for preliminary injunction enjoining City from mandating vaccination to keep their jobs providing protection and security to the community they serve.

DATED: October 21, 2021                    WATKINS & LETOFSKY, LLP

                                   By:    */s/   Daniel R. Watkins*_____
                                          Daniel R. Watkins
                                          *Attorneys for Plaintiffs*

DATED: October 21, 2021                    PACIFIC JUSTICE INSTITUTE

                                   By:    */s/   Kevin T. Snider* _____
                                          Kevin T. Snider
                                          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically transmitted the attached **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE CITY OF LOS ANGELES ORDINANCE NO. 1871342** to the Clerk's Office using CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM ECF registrants:

> Erika Johnson-Brooks
>
> Jennifer Gregg
>
> Travis Hall

On behalf of Defendants including:

CITY OF LOS ANGELES
c/o City Clerk
200 North Spring Street, Room 395
Los Angeles, California 90012

ERIC GARCETTI
200 N. Main St. – City Hall East
Los Angeles, CA 90012
(213) 978-7100

MICHAEL MOORE
200 N. Main St. – City Hall East
Los Angeles, CA 90012
(213) 978-8300

MATTHEW SZABO
c/o City Clerk
200 North Spring Street, Room 395
Los Angeles, California 90012

*/s/ Naomi Berry*

_____
Naomi Berry

---

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE CITY OF LOS ANGELES ORDINANCE NO. 1871342**