Daniel R. Watkins (SBN 163571)
dw@wl-llp.com
WATKINS & LETOFSKY, LLP
2900 S. Harbor Blvd., Suite 240
Santa Ana, CA 92704
T: 949-476-9400

Kevin T. Snider (SBN 170988)
ksnider@pji.org
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827-6600
T: 916-857-6900

Attorneys for Plaintiffs, MICHELLE LEMONS, RODGINALD CAYETTE,
MICHAEL PUNO, SUSANA REYNOSO, ANA FUENTES, MICHAEL PARKS,
EVLIN AKSERELIAN, MATTHEW GONZALEZ, PATRICIA GONZALEZ,
LAURISSA PROVOST, SUSAN GARCIA, CHRISTOPHER SILVA,
GEORGINA GRIEGO

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE LEMONS, et al., | Case No.: 2:21-cv-07296-RGK-JPR |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| CITY OF LOS ANGELES, et al., | |
| Defendants. | Date:        December 13, 2021<br>Time:        9:00 a.m.<br>Courtroom:   850<br>Judge:       Hon. R. Gary Klausner |

---

# **TABLE OF CONTENTS**

I.   INTRODUCTION ....................................................... 7

II.  STATEMENT OF FACT ............................................... 7

    A.  Los Angeles Vaccine Mandate (Ordnance No. 187134) ....................... 7

    B.  Religious Exemption Request Procedure ................................ 8

III. LEGAL STANDARD ................................................. 9

IV. ARGUMENT ........................................................ 9

    A.  Count I - The Fourth Amendment Protects Plaintiffs

    from Intrusive Medical Testing .......................................... 9

        1.  The Ordinance's requirement that unvaccinated employees

        must submit to weekly COVID tests violates Plaintiffs'

        Fourth Amendment rights .......................................... 9

        2.  The "limited circumstances" in which public employees'

        Fourth Amendment rights may be overridden do

        not justify Defendants' sweeping mandate ......................... 10

        3.  The Supreme Court meant what it said—no across-the-board

        testing regimes will be tolerated ...................................... 13

    B.   Count II – California Privacy Rights Give Clear, Independent

    Protections to Plaintiffs ................................................ 15

    C.  Counts III & IV - The Ordinance Violates Plaintiffs'

    Due Process Rights .................................................... 19

        1.  The vaccine mandate is subject to strict scrutiny........................ 20

        2. *Jacobsen* and *Klaassen* are napt to this case .............................. 21

        3.  The Ordinance's vaccine mandate fails under both

        the rational basis and strict scrutiny standard .................. 22

    D.  Counts V & VI - Plaintiffs Allege Sufficient Facts to State

    Causes of Action under Title VII and FEHA ............................. 23

1        1.  Plaintiffs have met their burden to establish a

2       prima facie case under Title VII and FEHA  .................................... 24

3       2.  Plaintiffs have alleged facts to establish standing

4       under Title VII and FEHA  ................................................................. 25

5  V.  CONCLUSION ............................................................................................ 26

## **<u>TABLE OF AUTHORITIES</u>**

**CASES**

*American Federation of Government Employees, AFL-CIO v. Roberts*,

   9 F.3d 1464 (9th Cir. 1993)  ...................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................... 9

*Ball v. Massanari*, 254 F.3d 817 (9th Cir. 2001)........................................20

*Berry v. Dep't of Soc. Servs.*, 447 F.3d 642 (9th Cir. 2006)  ...................................25

*Board of Medical Quality Assurance v. Gherardini*,

   93 Cal. App. 3d 669 (1979)  ...................................16

*Brown v. Smith,* 24 Cal. App. 5th 1135 (2018) ........................................19

*California* v. *Trombetta*, 467 U.S. 479 (1984)  ........................................10

*Chandler v. Miller*, 520 U.S. 305 (1997)...........................................10, 12

*Chavez v. United States*, 683 F.3d 1102 (9th Cir. 2012) ................................ 9

*City of Cleburne, Tex. V. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..................20

*Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990)  ...................................20

*Dykzeul v. Charter Communs., Inc.*, No. CV 18-05826 DSF (GJSx),

   2019 U.S. Dist. LEXIS 228981 (C.D. Cal. Nov. 18, 2019)  ...............................23

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) .........................................21

*Haney v. Pritzker*, No. 20 C 3653, 2021 U.S. Dist.

   LEXIS 184301 (N.D. Ill. Sep. 27, 2021)  ........................................21, 22

*Harris v. City of Santa Monica*, 56 Cal. 4th 203 (2013)  ................................25, 26

*Hill v. NCAA*, 7 Cal. 4th 1 (1994) ........................................16, 17

*Holloway v. Price*, No. CV 14-5987, 2015 U.S. Dist. LEXIS

   46034 (C.D. Cal. Mar. 9, 2015) ........................................20

*Jackson v. Gates*, No. 90-55728,1992 U.S.App. Lexis

   31201 (9th Cir. Nov. 27, 1992).........................................14, 15

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)  ........................................21

*King v. Rubenstein*, 825 F.3d 206 (4th Cir. 2016) ................................20

---

1 | *Klaassen v. Trs. Of Ind. Univ.*, No. 1:21-CV-238 DRL, 2021
2 |    U.S. Dist. LEXIS 133300 (N.D. Ind. Jul. 18, 2021) ............................................ 21
3 | *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 596  (2013) ............. 22
4 | *Lanier v. City of Woodburn*, 518 F.3d 1147 (9th Cir. 2008) ................................. 15
5 | *Loder v. City of Glendale*, 14 Cal. 4th 846 (1997)  ......................................17, 18, 19
6 | *Long Beach City Employees Assn. v. City of Long Beach*,
7 |    41 Cal. 3d 937 (1986)  ........................................................................................ 18
8 | *Los Angeles Police Protective League v. Gates,* 907 F.2d
9 |    879 (9th Cir. 1990) ............................................................................................. 15
10 | *Love v. Cal. Dept. of Educ.*, 29 Cal. App. 5th 980 (2018) .................................... 19
11 | *Nat'l Treasury Employees v. Von Raab*, 489 U.S. 656 (1989)........................ 10, 11
12 | *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d
13 |    1260 (9th Cir.  1998) ....................................................................................... 13, 14
14 | *Opuku-Boateng v. State of Cal.*, 95 F.3d 1461 (9th Cir. 1996)  ........................... 25
15 | *Perry v. Sinderman*, 408 U.S. 593, 595 (1972) ..................................................... 22
16 | *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020) .................................... 22
17 | *Schmerber v. California*, 384 U.S. 757 (1966) ......................................................10
18 | *Skinner v. Ry Labor Executives' Ass'n*, 489 U.S. 602 (1989)  ............................. 10
19 | *Shelley v. Kramer*, 334 U.S. 1 (1948) ................................................................... 20
20 | *Taylor-Failor v. County of Haw.*, 90 F. Supp. 3d 1095 (D. Haw. 2015) .............. 15
21 | *Thoms v. Maricopa Cty . Cmty. Coll. Dist.*, No. CV-21-01781-PHX-SPL,
22 |    2021 U.S. Dist. LEXIS 214822 (D. Ariz. Nov. 5, 2021) .................................... 21
23 | *Tandon v. Newsom*, 141 S. Ct. 1294 (2021)  ........................................................ 22
24 | *Thor v. Superior Court*, 5 Cal. 4th 725 (1993)  ................................................... 20
25 | *Vernonia Sch. Dist. 47-J v. Acton*, 515 U.S. 646 (1995)  .................................... 11
26 | *Wilkinson v. Times Mirror Corp.*, 215 Cal. App. 3d 1034 (1989) .........................18
27 | *Whitlow v. Cal. Dept. of Educ.,* 203 F. Supp. 3d 1079 (S.D. Cal. 2016) .............. 19
28 | *Zablock v. Redhail*, 434 U.S. 374 (1978) .............................................................. 21

**UNITED STATES CONSTITUTION**

U.S. Const. amend. XIV ...............................................................................19

**UNITED STATES CODE**

42 U.S.C. § 2000e ................................................................................ 23

**CALIFORNIA CONSTITUTION**

Article 1, Section 1 ...............................................................................16

**CALIFORNIA CODE**

Gov't Code § 12900 ............................................................................. 23

**LOS ANGELES CITY ORDINANCE**

Ordinance No. 187134 ................................................................... 7, 8, 25

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Fourth Amendment serves to protect citizens from the groping hands of overreaching municipal officials against warrantless searches of "persons, houses, papers and effects" that stand as unreasonable and without probable cause. Moreover, the First Amendment's free exercise clause further protects citizens from a government search and purge of heretics.  But when a municipality divests citizens of the control and integrity of their bodies and the conviction of their souls, they rob them of their constitutional rights and strip them of their human dignity. This is what the City seeks to do to its own employees.  In contrast, this lawsuit seeks the restoration of liberties secured under the Bill of Rights designed to restrain the state.

## II.   STATEMENT OF FACTS

### A.   Los Angeles Vaccine Mandate (Ordnance No. 187134)

On August 20, 2021, Mayor Garcetti signed and approved Ordinance No. 187134 (herein "Ordinance").  First Amended Complaint (herein "FAC") ¶ 25, Ex. 1-005-011, Dkt. 16.  Section 4.701(b) of the Ordinance mandates that "[a]s of October 20, 2021, the *COVID-19 vaccination and reporting requirements are conditions of City employment and a minimum requirement* for all employees, unless approved for an exemption from the COVID-19 vaccination requirement as a reasonable accommodation for a medical condition or restriction or sincerely held religious beliefs. Any employee that has been approved for an exemption must still report their vaccination status." *Id*. at Ex. 1-007 (emphasis added).

Section 4.702, subdivision (a), of the Ordinance permits "Qualified Exemptions" for "[e]mployees with medical conditions/restrictions or sincerely held religious beliefs, practices, or observances that prevent them from receiving a COVID-19 vaccine."  FAC, Ex. 1-008.  However, Section 4.702, subdivision (b), adds that employees who qualify for "medical or religious exemptions and who are

required to regularly report to a City worksite shall be subject to weekly COVID-19 tests." *Ibid.* In turn, Section 4702 makes clear that "employees will not have the option to 'opt out' of getting vaccinated and become subject to weekly testing. Only those with a medical or religious exemption and who are required to regularly report to a work location are eligible for weekly testing." *Ibid.*

Further, Section 4.704 of the Ordinance prohibits employees, even if they qualify for an exemption, from receiving promotions or transfers and regardless of the weekly testing requirement: "All employees whose vaccination status is unvaccinated, partially vaccinated, or unreported shall be ineligible to promote or transfer *until the employee has reported to the appointing authority that they have been fully vaccinated*." FAC, Ex. 1-009 (emphasis added).

## B. Religious Exemption Request Procedure

To advance their intent to coerce employees to be vaccinated and with an indifference toward legitimate requests for religious exemptions, Defendants distributed a "COVID-19 Vaccination Requirement Exemption Request Procedures" form (herein "Request Procedures Form") to Plaintiffs and other LAPD personnel. FAC ¶ 56. The Request Procedures Form requires that, to request a religious exemption, an employee must not only "complete and sign [a] Request for Religious Exemption Form," but also that the "employee must also submit a completed Religious Accommodation Certification Form from their religious organization, religious leader, religious scholar, or person knowledgeable of their religious beliefs, practice or observances to support their request." FAC, Ex. 4-5. Moreover, the Request for Religious Exemption Form (herein "Religious Exemption Form") asks several unlawful questions designed to determine whether the employee has a "correct," "proper," or "valid" understanding of religious doctrine and whether the employee's sincerely held religious beliefs are shared broadly among other faithful. FAC, Ex. 5. With this form, Defendants ignore the legal protections afforded employees in that their religious beliefs need not be

acceptable, comprehensible, consistent, or logical to others in order to merit protection.  Similarly, the "Religious Accommodation Certification Form" (herein "Religious Certification Form") requires the employee to obtain third-party verification, under penalty of perjury, not only as to whether the employee has a sincerely held religious belief, but also as to the nature of the "tenets, practices, and observations" of the "church, religious denomination, religious organization and/or … religious belief system."  FAC, Ex. 6.

## III.   LEGAL STANDARD

A motion to dismiss should be denied if the complaint "'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' … 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Chavez v. United States*, 683 F.3d 1102, 1108-09 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.   ARGUMENT

### A.   Count I - The Fourth Amendment Protects Plaintiffs from Intrusive Medical Testing

#### 1.   The Ordinance's requirement that unvaccinated employees must submit to weekly COVID tests violates Plaintiffs' Fourth Amendment rights.

For decades, federal precedent has protected public employees from intrusive medical testing.  Mandated extraction and testing of bodily specimens unquestionably constitute Fourth Amendment searches.  Until quite recently, it was indisputable that forced medical testing constituted a significant privacy intrusion, and thus a Fourth Amendment search that required either a warrant, individualized suspicion of wrongdoing, or a special needs exception to be upheld.

The Supreme Court has explained that compelled intrusion into the body— whether to test breath, blood, or urine—implicates the Fourth Amendment "at

several levels." *Skinner v. Ry Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989). While urine tests raise the most obvious specter of discomfiture, being compelled to yield even one's breath for testing compromises bodily integrity and constitutes a Fourth Amendment search. *Id.* at 616-617 (*citing, among others, California* v. *Trombetta*, 467 U.S. 479, 481 (1984), and *Schmerber v. California*, 384 U.S. 757, 767-68 (1966)).

For present purposes, it is immaterial whether the specific compelled invasion is a vaccine, a PCR test, or a saliva test; all equally implicate varying degrees of "concerns about bodily integrity" (*Skinner*, 489 U.S. at 617) that constitute a search. But it is not just the extraction of bodily specimens that creates a search. The Supreme Court has explained that testing of such specimens creates independent Fourth Amendment invasions, because of the sensitive information revealed. "The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests." *Skinner*, 489 U.S. at 617. Stated another way, chemical analysis "can reveal a host of private medical facts about an employee." *Id.*

There can be little reasonable dispute that the COVID tests required by Defendants -- designed to elicit information about the status of employees' medical conditions -- whether cast as accommodations or conditions of employment, all trigger the Fourth Amendment. The more pressing question is whether ordinary constitutional safeguards can be obviated because Plaintiffs are public employees. To this, the Supreme Court and the courts of this Circuit offer an emphatic *no*.

2. **The "limited circumstances" in which public employees' Fourth Amendment rights may be overridden do not justify Defendants' sweeping mandate.**

The Supreme Court has explained that intrusive testing must be the exception and not the norm, allowable only in "certain limited circumstances." *Chandler v. Miller*, 520 U.S. 305, 308 (1997) (quoting *Nat'l Treasury Employees v. Von*

*Raab*, 489 U.S. 656, 668 (1989)).  Defendants now ask this Court to unilaterally turn "certain limited circumstances" into uncertain, unlimited circumstances in which testing (or even greater intrusions) would be imposed.

In their pursuit of unfettered authority, Defendants deftly avoid discussing controlling Fourth Amendment precedent in the public employment context. Instead, they seek to divert attention to school cases that dealt with markedly different considerations.   For example, Defendants lean heavily on *Vernonia Sch. Dist. 47-J v. Acton*, 515 U.S. 646 (1995).  Defendants' Motion to Dismiss (herein "Motion") at 6, Dkt. 42.  *Vernonia* upheld drug testing in the special circumstances of student athletes.  The Supreme Court determined that fair competition and the school's unique responsibility for students' safety justified randomized drug testing, despite the privacy concerns.  But the Court's approach and precision of analysis stand in contrast to the Defendants' across-the-board vaccine-or-test regime for all City personnel.  As will be seen, the Court's more pertinent precedents make clear that it has endorsed no such cancellation of privacy rights for public employees or officeholders.

In *Skinner*, the Supreme Court carefully considered and upheld drug testing for railway employees who had been involved in serious accidents. Not surprisingly, the Court determined that the narrow category of employees tested, and the heightened level of scrutiny and investigation following rail incidents that had threatened life and property justified what would otherwise be a Fourth Amendment invasion.  The Court by no means approved across-the-board testing for broad categories of rail employees.

In *Von* Raab*,* decided the same day as *Skinner*, the Supreme Court reached a similar conclusion as to certain U.S. Customs agents seeking promotion.  It made sense to the Court that those directly involved in drug enforcement could be expected to submit to drug testing themselves.  The Court was not comfortable, though, with the Treasury Department's attempt to extend drug testing to broader

categories of employees who dealt with classified documents.  The inclusion in this class of accountants, attorneys, mailroom clerks and messengers, among others, gave the Court pause and it therefore refused to uphold that portion of the drug testing program, remanding it instead for further reconsideration.

Since *Skinner* and *Von Raab*, the Supreme Court has rebuffed attempts by state or local officials to extend these holdings beyond their narrow confines.  In *Chandler*, the Court invalidated a Georgia law that had sought to impose drug testing on judges and candidates for state office, not unlike what the Defendants here attempt to do by extending their mandate even to political appointees.  The Court was leery of open-ended justifications for further diminishing the reach of the Fourth Amendment.  Georgia thought it had an especially strong argument for controlling its own qualifications for elected office, but the Court disagreed: "We therefore reject respondents' invitation to apply in this case a framework extraordinarily deferential to state measures setting conditions of candidacy for state office."  *Chandler*, 515 U.S. at 317-318.  What Defendants are attempting to do here to public employees is reminiscent of what Georgia sought to do to public officeholders.

The Supreme Court went even further in *Chandler* to reject efforts like the present all-out push for mass vaccinations designed to enforce uniformity on public employees so other citizens would follow suit: "Indeed, if a need of the 'set a good example' genre were sufficient to overwhelm a Fourth Amendment objection, then the care this Court took to explain why the needs in *Skinner*, *Von Raab* and *Vernonia* ranked as 'special' wasted many words in entirely unnecessary, perhaps even misleading, elaborations."  *Id*. at 318.  In short, the Court has made abundantly clear that it will not countenance across-the-board exceptions to the Fourth Amendment aimed at public employees.  Plaintiffs here have pled a Fourth Amendment violation squarely within the holdings of *Skinner, Von Raab,* and *Chandler.*

### 3. The Supreme Court meant what it said—no across-the-board testing regimes will be tolerated.

The Ninth Circuit has consistently followed the Supreme Court in carefully limiting the type of Fourth Amendment invasions that can be demanded of public servants. In *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260 (9th Cir. 1998), the appellate court sided with employees who had been subjected to intrusive medical questionnaires and testing. Unbeknownst to the employees until later, the lab also tested some of their specimens for syphilis, pregnancy, and sickle cell traits. The district court accepted the argument that the employees had already consented to considerable invasions, so the additional testing was inconsequential, but the appellate court strongly disagreed, reiterating the differences between submitting some medical information to an employer with maintaining privacy as to one's bodily conditions:

> "[I]t is not reasonable to infer that a person who answers a questionnaire upon personal knowledge is put on notice that his employer will take intrusive means to verify the accuracy of his answers. There is a significant difference between answering on the basis of what you know about your health and consenting to let someone else investigate the most intimate aspects of your life. Indeed, a reasonable person could conclude that by completing a written questionnaire, he has reduced or eliminated the need for seemingly redundant and even more intrusive laboratory testing in search of highly sensitive and non-job-related information."

*Id.* at 1268 (footnote omitted).

In like manner, here the Plaintiffs have not consented to the egregious vaccine-or-test mandate, either by submitting to prior physical exams as part of their fitness for duty, or by submitting information about their vaccine

---

status. To ensure that its point was not missed, the appellate court expanded on it as follows:

> "That one has consented to a general medical examination does not abolish one's privacy right not to be tested for intimate, personal matters involving one's health—nor does consenting to giving blood or urine samples, or filling out a questionnaire.  As we have made clear, revealing one's personal knowledge as to whether one has a particular medical condition has *nothing* to do with one's expectations about actually being tested for that condition…. [I]f unauthorized, the testing constituted a significant invasion of a right that is of great importance, and labelling it minimal cannot and does not make it so."

*Id.* at 1270 (emphasis in original) (footnotes omitted).

Thus, the Ninth Circuit appellate court staunchly defended the public employees' rights not to be tested without their consent, even though they suffered no adverse employment actions because of the testing.   The violation is all the greater where, as here, the Defendants are threatening serious consequences—including termination—if Plaintiffs do not relinquish their privacy rights.

Beyond public employees, the Ninth Circuit's limits on searches by law enforcement officers are instructive.   More than once, the appellate court has rebuked LAPD specifically for assuming that its authority to require drug testing of officers allowed it to ignore their Fourth Amendment rights altogether.   Thus, in *Jackson v. Gates*, No. 90-55728,1992 U.S.App. Lexis 31201 (9th Cir. Nov. 27, 1992), an officer who, having associated with another officer suspected of drug involvement, was confronted at his home and ordered to produce a specimen for drug testing.   The court considered—and rejected—the argument that *Von Raab* opened the door to broader incursions on officers' Fourth Amendment rights.   The court also rejected the notion that, to have a claim, the officer must have first

submitted to the unlawful search.  This discussion is relevant here to underscore the illegality of what Defendants are attempting to do, and why the Plaintiffs are resisting:

> "As the Supreme Court pointed out in *Gardner v. Broderick,* 392 U.S. 273, 276-79 (1968), it is improper to discharge an officer from duty to punish him for exercising [constitutional] rights…. Thus, it is established law that no one should suffer harm by state action for asserting a constitutionally protected right. [¶] The … order Jackson disobeyed required him to submit to an unconstitutional search. Because the right to be free from unreasonable searches is contained explicitly in the Fourth Amendment, it follows that the right to be free from adverse consequences for refusing to submit to an unreasonable search must also be found there."

*Id.* at 12-13 (relying on *Los Angeles Police Protective League v. Gates,* 907 F.2d 879 (9th Cir. 1990)).

Finally, Defendants could have tailored its privacy invasion to individualized suspicion of wrongdoing, but instead, they imposed across-the-board privacy invasions of tens of thousands of employees.  Such approaches have repeatedly been invalidated.  *See, e.g., Lanier v. City of Woodburn*, 518 F.3d 1147 (9th Cir. 2008) (striking down drug testing program applied to library page position); *Taylor-Failor v. County of Haw.*, 90 F. Supp. 3d 1095 (D. Haw. 2015) (granting temporary restraining order to legal clerk to prevent urinalysis before she started work).  In short, Defendants advocate a standard that could aptly be described, as was the State's argument in *Chandler*, as "extraordinarily deferential to state measures." Such an approach was rejected there, and it should be rejected here.

**B.    Count II – California Privacy Rights Give Clear, Independent Protections to Plaintiffs**

1    The analysis of Plaintiffs' privacy rights arising out of Article I, Section 1, of
2    the California Constitution is similar to that of the Fourth Amendment, but counsels
3    even more strongly against Defendants' actions, and against dismissal.

4        In *Hill v. NCAA*, 7 Cal. 4th 1 (1994), the California Supreme Court went to
5    considerable lengths to expound on the nature and scope of the privacy right set
6    forth in Article I, Section 1, of the California Constitution. The Court observed that
7    the right is express, not implied, in the California Constitution, having been added
8    by voter initiative in the 1970's. Based on the initiative's history, the Court
9    recognized it as applying to private entities as well as government, making its scope
10   significantly greater than the Fourth Amendment. *Id.* at 20. The Court also
11   analyzed it in two related but distinct aspects: informational and autonomy privacy.
12   *Id.* at 35.

13       For purposes of analyzing the present claims, the Court's identification of
14   medical information and testing as areas fraught with privacy concerns is crucial.
15   In this regard, the Court held that, by collecting and testing specimens and asking
16   about medications and substances ingested, "the NCAA obtains information
17   about the internal medical state of an athlete's body that is regarded as personal and
18   confidential. *Hill*, 7 Cal. 4th at 41 (citing *Board of Medical Quality Assurance v.*
19   *Gherardini*, 93 Cal. App. 3d 669, 678 (1979) ("A person's medical profile is an area
20   of privacy infinitely more intimate, more personal in quality and nature than many
21   areas already judicially recognized and protected.")). Further, the Court held that
22   the interest in "limiting disclosure of confidential information about bodily
23   condition" implicates informational privacy. *Ibid.*

24       As in *Vernonia*, *supra*, the Court in *Hill* then focused on the "unique set of
25   demands" inherent in athletic competition that, in the Court's view, diminished an
26   athlete's personal privacy expectations in his or her internal and external bodily
27   condition. *Id.* at 42. Among other things, the Court observed that, unlike one's
28   livelihood, college athletics were not an "economic necessity" for the participants.

*Ibid.* Lest there be any doubt about the limits of its holding, the Court further cautioned, "[e]mployment settings are diverse, complex, and very different from intercollegiate athletic competition." *Id.* at 54. While acknowledging exceptions identified in decisions such as *Skinner* and *Von Raab*, the Court was leery of endorsing broader scale medical testing that it feared would lead to an Orwellian world. *Id.* at 54-55 (quoting *American Federation of Government Employees, AFL-CIO v. Roberts*, 9 F.3d 1464, 1468 (9th Cir. 1993)).

The California Supreme Court took the opportunity a few years later to further expound on the nature of privacy rights for public employees in *Loder v. City of Glendale*, 14 Cal. 4th 846 (1997). The Court considered what it described as an "across-the-board" drug testing program for all city employees newly hired or newly promoted. *Id.* at 852. The similarities to Defendants' vaccine-or-test program for all city personnel in the instant case are striking. In short, the Court held that Glendale could only conduct drug testing of new hires, not existing employees. *Id.* at 852-853. The Court followed—and analyzed in considerable detail—the path laid down by the United States Supreme Court in *Skinner* and *Von Raab*, and to a lesser extent in *Vernonia*. *Id.* at 866-880. With this background, the Court was confident that the City's across-the board drug testing of all current employees seeking promotion violated the Fourth Amendment, but a similar requirement for new applicants did not. For new applicants, the Court was concerned that the employer would not have had the same opportunities to observe the individual's behavior as it would with longtime employees seeking promotion. *Id.* at 883-884. And significantly, the Court noted that the drug testing was a more recent addition to a physical exam that the City had required of new applicants for at least 10 years previously. *Id.* at 854. The plaintiffs had not challenged this intrusive exam, so the Court accepted its legality. *Id.* at 885.

The Supreme Court in *Loder* then turned to Article I, Section 1, focusing only on the part of the testing program it had deemed consistent with the Fourth

Amendment.  The Court revisited *Hill* in some detail, along with an earlier appellate decision that had upheld drug testing for job applicants, *Wilkinson v. Times Mirror Corp.*, 215 Cal. App. 3d 1034 (1989).  Importantly, the Court cautioned that Hill should not be interpreted so as to create extra hurdles for plaintiffs which might lead to their privacy claims being dismissed out of hand:

> *"*[A]n interpretation of *Hill* that would permit the rejection of a claim involving a significant intrusion upon a constitutionally protected privacy interest—without considering or weighing the justifications supporting the intrusive conduct—not only would discard the basic constitutional analysis consistently applied by California courts for the past two decades in resolving claims under the state constitutional privacy clause, but also would signify that the California Constitution, which includes an *express* provision guaranteeing the right of privacy, would provide substantially *less*  protection of that right than does the federal Constitution, in which the right of privacy is only *implied*.*"*

*Id.* at 892-893 (emphasis in original).  The more intrusive the testing or other invasion, the more compelling must be the Defendant's justification.  *Id.* at 890 (quoting *Hill*, 7 Cal. 4th at 34.).  Even in the face of an asserted justification for the intrusion, a plaintiff may rebut it by offering a feasible, effective alternative that has less of an impact on privacy interests.  *Loder*, 14 Cal. 4th at 891; *accord Long Beach City Employees Assn. v. City of Long Beach*, 41 Cal. 3d 937, 943-948 & fn. 12 (1986) (requiring compelling interest and no less intrusive means to justify intrusion on employee's privacy interest through a polygraph).

Ultimately, the Supreme Court in *Loder* upheld the drug testing requirement for applicants for reasons similar to its Fourth Amendment analysis—the employer's inability to otherwise observe the applicant's on-the-job behavior and possible impairment, and the presumed validity of the underlying pre-employment medical exam.  *Id.* at 897-898.  The Court took a different approach than had the

United States Supreme Court in one key respect: its disposition of the case. The trial court had conducted an exhaustive review of 80 job categories and determined that just under half of them could not be subjected to drug testing. The appellate court largely agreed, but expanded the number of categories protected from testing. The Supreme Court, by contrast, set aside the promotion aspect of the testing program as overbroad and sent the City back to the drawing board to fashion a much narrower, more constitutional program. *Id.* at 898-900.

Taken together, the lessons of *Loder* are straightforward for this case. First, Defendants cannot implement an across-the-board vaccine-or-test regime for current employees like the Plaintiffs. Second, to invasion of Plaintiffs' fundamental privacy rights, Defendants must not only assert a compelling interest, but also must show that no less intrusive means are available to accomplish it. Lastly, rather than try to salvage the mandate in some respect, the Court should simply set it aside and send the Defendants back to the drawing board.

A final observation is in order as to the relevance of school-vaccine decisions. As the California Supreme Court made clear in *Hill* and *Loder*, students are in a very different posture than public employees. Decisions such as *Brown v. Smith,* 24 Cal. App. 5th 1135 (2018), *Love v. Cal. Dept. of Educ.*, 29 Cal. App. 5th 980 (2018), and *Whitlow v. Cal. Dept. of Educ.,* 203 F. Supp. 3d 1079 (S.D. Cal. 2016), therefore do not countermand or undermine the approach prescribed by the California Supreme Court for Article I, Section 1, analysis. In short, Plaintiffs have pled a well-founded claim for violation of Article I, Section 1, of the California Constitution that by no means should be dismissed.

### C.   Counts III & IV – The Ordinance Violates Plaintiffs' Due Process Rights

The Due Process Clause of the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law …." U.S. Const., amend. XIV, sec. 1. This applies to states and local governments.

*Shelley v. Kramer*, 334 U.S. 1, 14 (1948).  In turn, every substantive due process analysis asks the question:  Has there been some governmental action that interferes with an individual right rising to the level of an unconstitutional deprivation?  Here, the governmental action is the vaccine mandate for all City employees, and the answer to the question of whether it rises to unconstitutional deprivation is "Yes."

### 1.  The vaccine mandate is subject to strict scrutiny.

Courts have split substantive due process cases into two categories: those involving fundamental rights and those involving non-fundamental rights. Fundamental rights are those which bear some relation to the right of autonomy or the right of privacy.  Here, the fundamental right at stake is each Plaintiff's right to refuse medical treatment.  "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."  *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990); *cf. Thor v. Superior Court*, 5 Cal. 4th 725, 732 (1993) ("After due deliberation, we hold that under California law a competent, informed adult has a fundamental right of self-determination to refuse or demand the withdrawal of medical treatment of any form irrespective of the personal consequences.")

In turn, the standard of scrutiny is different for each category, i.e., fundamental versus non-fundamental rights.  Thus, while legislation is generally "presumed valid 'if the classification drawn by the statue is rationally related to a legitimate state interest,'" this "'rational relation' test gives way to a 'strict scrutiny' standard … when a statute classifies by religion or a national origin, or 'burdens the exercise of a constitutional right.'"  *Holloway v. Price*, No. CV 14-5987, 2015 U.S. Dist. LEXIS 46034, at * 19 (C.D. Cal. Mar. 9, 2015) (citing *City of Cleburne, Tex. V. Cleburne Living Ctr.* 473 U.S. 432, 440 (1985) and *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001)).  Under strict scrutiny, "[w]hen a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interest *and is closely tailored*

*to effectuate only those interests*." *Zablock v. Redhail*, 434 U.S. 374, 389 (1978). (Emphasis added.) Because this case involves a fundamental right, the appropriate standard of scrutiny is strict scrutiny, and not rational basis.

Moreover, Defendants' use of the Religious Exemption and Religious Certification Forms, as well as requests for medical exemptions, creates a review process that is the "type of individualized mechanism that triggers strict scrutiny under [*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)]." *Thoms v. Maricopa Cty . Cmty. Coll. Dist.*, No. CV-21-01781-PHX-SPL, 2021 U.S. Dist. LEXIS 214822, at *30 (D. Ariz. Nov. 5, 2021). In *Thoms*, the court explained "that the mere creation of a formal mechanism granting exceptions makes a policy not generally applicable 'because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* at 30. Thus, in considering a religious exemption process similar to Defendants, the court found: "Here, Defendant denied Plaintiffs' requested accommodations because '[r]eligious accommodations are made on a case-by-case basis taking into account many factors, including the impact such an accommodation will have on the education environment as a whole.' … It is the mere creation of an individualized exemption process that triggers strict scrutiny." *Id.* at 31. Thus, Defendants' use of a case-by-case process for reviewing requests for exemptions mandates that the Ordinance be viewed with strict scrutiny. FAC, Ex. 4-2 ("Departments must review requests for exemption from the City's COVID-19 Vaccination Requirement on a case-by-case basis ….").

## 2. *Jacobson* **and** *Klaassen* **are inapt to this case.**

Defendants' reliance on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and *Klaassen v. Trs. Of Ind. Univ.*, 2021 U.S. Dist. LEXIS 133300 (N.D. Ind. Jul. 18, 2021) for the proposition that the standard of scrutiny applicable to the vaccine mandate is a rational basis scrutiny is misplaced. In *Haney v. Pritzker*, No. 20 C 3653, 2021 U.S. Dist. LEXIS 184301 (N.D. Ill. Sep. 27, 2021), the court succinctly

noted that *Jacobson* "pre-dated the modern tiers of [constitutional] scrutiny and simply applied "what would now be considered the rational basis standard." *Id.* at 33 (quoting Justice Gorsuch's concurrence in *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 70 (2020)).  Moreover, in *Cuomo*, Justice Gorsuch explained that "[r]ational basis review is the test this Court *normally* applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, *or a claim of fundamental right*.  Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so."   Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue— exactly what the Court does today. Here, that means strict scrutiny …." *Cuomo*, 141 S. Ct. at 70; *see also Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (applying strict scrutiny to enjoin COVID-related restrictions on religious gatherings).

Thus, unlike *Jacobsen* and *Klaassen* which is also cited by Defendants, the proper standard of scrutiny is strict scrutiny because a fundamental right is involved, i.e., right to refuse medical treatment, as well as an individualized exemption process, i.e., a case-by-case review of the medical and religious exemption requests under the Ordinance.[1]

### 3.   The Ordinance's vaccine mandate fails under both the rational basis and strict scrutiny standard.

As the First Amended Complaint alleges, mandatory vaccination does not serve a public health interest. The vaccines do not prevent contraction or transmission of COVID-19. As such, mandating vaccination does not reduce the potential risk to the public.  FAC ¶ 33 ["The CDC reported that 'new scientific

---

[1] Defendants urge that Plaintiffs' do not have an interest in public employment. (Motion at 15:18-21.) This ignores the "unconstitutional conditions doctrine." *Perry v. Sinderman*, 408 U.S. 593, 595 (1972); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 596  (2013).

data' indicates that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels."].) Even under a rational basis scrutiny, the fact that vaccines do not prevent contraction or transmission means that the mandate is not rationally related to the stated interest of stemming infections among Defendants' employees and the general public.

Likewise, the Ordinance makes no accommodation for people with natural immunity, despite the fact that "peer-reviewed studies comparing naturally acquired and vaccine acquired immunity … show overwhelmingly naturally acquired immunity provides equivalent or greater protection against server infection than immunity generated by mRNA vaccines."  FAC ¶ 31; see also ¶¶ 32, 33-36. Defendants' mandate provides no reason why those with naturally acquired immunity must obtain a vaccination to achieve an "immunity" that they already possess (one that is as, if not more, effective than that provided by the vaccine). Accordingly, there is no basis, under either a rational basis scrutiny or strict scrutiny, to force what should be a personal medical choice on Plaintiffs.

## D. Counts V & VI - Plaintiffs Allege Sufficient Facts to State Causes of Action under Title VII and FEHA

Title IV (42 U.S.C. § 2000e et seq.) and California's Fair Employment and Housing Act (herein "FEHA," Government Code § 12900 et seq.) provide broad workplace protections for employees.  Both require an employer to reasonably accommodate an employee's sincere religious beliefs, unless such an accommodation would impose undue hardship. "The analysis of a religious discrimination claim is the same under FEHA and Title VII…. [T]he antidiscriminatory objectives and overriding public policy purposes of the two acts are identical." *Dykzeul v. Charter Communs., Inc.*, No. CV 18-05826 DSF (GJSx), 2019 U.S. Dist. LEXIS 228981, at *9 (C.D. Cal. Nov. 18, 2019).

Here, Defendants' exemption forms not only require and condition employment based upon the City's own qualitative opinion regarding the validity of the employee's religious beliefs, but additionally, require the employee's belief(s) to be further *confirmed* by a third party "official."   FAC ¶¶ 157-158.   The "Religious Exemption Form" specifically requires that "[t]o be eligible for this exemption, [the employee must] complete and submit both this form and a completed Religious Accommodation Certification Form."   FAC, Ex. 5-1 (emphasis in original).   In turn, the Religious Certification Form requires the employee to obtain third-party verification, under penalty of perjury, not only as to whether the employee has a sincerely held religious belief, but also as to the nature of the "tenets, practices, and observations" of the "church, religious denomination, religious organization and/or … religious belief system."   FAC, Ex. 6.   Thus, by their questions, the Defendants seek to value and rank an employee's religious beliefs based upon whether these beliefs are broadly shared and otherwise validated by "religious officials."   FAC, ¶¶ 157-158.

### 1. Plaintiffs have met their burden to establish a prima facie case under Title VII and FEHA.

Plaintiffs have alleged that Defendants' exemption forms place unlawful requirements upon responding employees as a condition of employment, regardless of whether Defendants take subsequent action based on their answers to the forms. As such, Plaintiffs have stated and established the necessary prima facie case for discrimination under Title VII and FEHA.

To establishing a prima facie case under Title VII or FEHA, "[t]he Ninth Circuit applies a two-part framework to analyze Title VII discrimination claims based on failure to accommodate.   A plaintiff must first establish a prima facie case of discrimination by showing: (1) she had a bona fide religious belief, the practice of which conflicted with an employment duty and (2) the employer subjected her to an adverse employment action because of her inability to fulfill the job

requirement." *Berry v. Dep't of Soc. Servs.* (9th Cir. 2006) 447 F.3d 642, 655 (9th Cir. 2006).  "Once a prima facie showing has been made, the burden shifts to [Defendants] to show that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship."  *Ibid.* (citations omitted); *see also Opuku-Boateng v. State of Cal.*, 95 F.3d 1461, 1467 (9th Cir. 1996) ("Only if the employer can show that no accommodation would be possible without undue hardship is it excused from taking the necessary steps to accommodate the employee's religious beliefs.").

### 2.    Plaintiffs have alleged facts to establish standing under Title VII and FEHA.

To establish standing to bring a cause of action for religious discrimination, Plaintiff are not required to allege they have already been terminated.  It is sufficient that Plaintiffs allege that they sincerely hold religious beliefs (FAC ¶¶ 154 & 170) and that Defendants have subjected them to adverse employment actions based upon a failure to provide any reasonable accommodation for these beliefs, or are likely to apply the alleged discriminatory practices to them or others in the future. *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 230 (2013).

Here, rather than attempt to accommodate Plaintiffs' beliefs, Defendants unlawfully seek to require Plaintiffs to "validate" their religious beliefs.  Further, while Defendants claim that they have made accommodations, Defendants continue to punish Plaintiffs based on their beliefs.  Thus, Section 4.704 of the Ordinance prohibits employees, even if they qualify for a religious exemption, from receiving promotions or transfers and regardless of the weekly testing requirement: "All employees whose vaccination status is unvaccinated, partially vaccinated, or unreported shall be ineligible to promote or transfer *until the employee has reported to the appointing authority that they have been fully vaccinated*."  FAC, Ex. 1-009 (emphasis added).

---

**PLAINTIFFS' OPPOSITON TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**
-25-

Finally, FEHA's express purpose of "provid[ing] effective remedies that will … prevent and deter unlawful employment practices" suggests that the prohibition against discrimination set forth in Government Code section 12940, subdivision (a), is not limited to instances where discrimination is a "but for" cause of the employment decision.  *Harris*, 56 Cal. 4th at 230.  "[T]he FEHA does not envision that individuals and the general public must tolerate discriminatory treatment in employment decision making until it finally costs someone a job or promotion. Instead, the Legislature expressly sought to '*prevent* and *deter* unlawful employment practices' (§ 12920.5, italics added)—in other words, to keep unlawful practices from happening in the first place. When discrimination has been shown to be a substantial factor motivating an employment action, a declaration of its illegality serves to prevent that discriminatory practice from becoming a 'but for' cause of some other employment action going forward."  *Ibid.*  Rather, "the public policy against employment discrimination '"inures to the benefit of the *public at large* rather than to a particular employer or employee."' It was precisely to address these wide-ranging harms that the Legislature recognized through the FEHA "the fundamental public interest in a workplace free from the pernicious influence of [discrimination]."  *Id.* at 230-231 (citations omitted).

## V.    CONCLUSION

For the reasons above, Plaintiffs ask that the Court deny Defendants' motion to dismiss.  Alternatively, Plaintiffs ask that the Court grant leave to Plaintiffs to amend their complaint to state a cause of action.


DATED: November 23, 2021                    WATKINS & LETOFSKY, LLP


By:  _____*/s/ Daniel R. Watkins*_____
     Daniel R. Watkins
     *Attorneys for Plaintiffs*